# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | | |
|---|---|---|
| GARDENIA OCASIO, | : | CASE NO. 1:14-CV-01585-NLH-JS |
| Plaintiff, | : | |
| v. | : | |
| EQUIFAX MORTGAGE SOLUTIONS, et al., | : : | **DECLARATION OF MERCEDES VELA** |
| Defendants. | : | |

I am making this Declaration based upon personal knowledge and I am competent to testify as to the matters stated below:

1.      I am the Vice President of Operations and Customer Solutions at CoreLogic Credco, LLC ("Credco").  I have been employed by Credco for over 20 years.  My responsibilities include Operations, employee training, reporting, project management and client integrations for various products including CredStar, a tri-merge statement platform.  I also am responsible for managing the team which responds to consumers' inquiries relating to this same product.

2.      In the 1990s, government-sponsored entities like Fannie Mae started using an automated underwriting process for residential real estate lending. As part of this automated process, the government-sponsored entities wanted to be

able to access and view all available credit information in a merged format, rather than requiring a manual review of a consumer's three separate reports from Equifax, Experian, and Trans Union (collectively, "Nationwide CRAs" or "NCRAs"). Credco provides prospective lenders with a product that merges information from the NCRAs. Credco does not maintain a database of the information that it assembles and merges into a new consumer report. Credco must fully transmit, without alteration, all data supplied by each NCRA relating to a consumer. For each order, Credco assembles information from the NCRAs and merges this information into a single document, which in this case was a CredStar Tri-Merge Statement.

3.   A lender or prospective lender (a "lender") submits to Credco information relating to the consumer applicant, which in this case included the applicant's name, address, social security number, and, on two occasions, age. Credco sends this information, without modification, to the NCRAs. The NCRAs' systems receive these identifiers and evaluate the information they have assembled from their "furnisher" sources to determine which of that information relates to the consumer who is the subject of the inquiry. They then furnish that information to Credco.

4.   The NCRAs alone determine whether a particular account (e.g., credit card or mortgage) relates to a specific consumer. Credco does not have any

role or input when the NCRAs evaluate the information they receive from various sources and match it to particular consumers, nor does Credco have any access to or understanding of each NCRA's proprietary algorithms and "matching" logic. It would not be practical for Credco to resolve variations in the over 18 million reports resold each year as less than .05% are disputed, only some of which involve a consumer claiming that an account is not hers. Credco has no visibility into how or why a specific NCRA decided to report a tradeline, and Credco has no means to question whether any variation suggests inaccuracy, or warrants further investigation. Credco uses a proprietary technical process to accurately assemble and merge the information that is provided by its established sources – the NCRAs – into its Tri-Merge Statements.

       5.     Credco uses reasonable procedures to accurately assemble and merge the information that is provided by its sources – the NCRAs – into its tri-merge statements. Credco uses an automated process to receive consumer identifying information from its customers (lenders) and transmit that same information directly to the NCRAs with a request for credit information relating to the identified consumer. Once Credco receives the requested information from the NCRAs, it merges the NCRA's information pursuant to a proprietary process, which employs rules dictated by underwriting requirements established by lenders, Fannie Mae and related entities. The Tri-Merge Statement merges the information

3

from the NCRAs and displays it using rules required by the lender, consistent with the underwriting standards of organizations such as Fannie Mae and the Federal Housing Authority. These underwriting standards require that Credco display all available information from all three NCRAs without alteration to enable the lender to review the information and determine if further inquiry with the NCRA or credit furnisher is required before making a decision on the loan application. Credco displays on the first page of the Tri-Merge Statement the information originally submitted by the user about the consumer applicant and conveyed to the NCRAs. Credco also displays the information received from the NCRAs in a manner to best aid the user in its review. Each item of information appearing on the report indicates which NCRA provided it to enable the lender to analyze and compare the information furnished by each NCRA. Neither the NCRAs nor the lenders expect or require Credco to evaluate the data or second guess whether the credit furnisher or NCRA performed their roles properly. Indeed, Credco is prohibited from doing so.

6.    On four separate occasions, Credco obtained information about Plaintiff from the NCRAs, specifically on October 14, 2013, November 14, 2013, March 19, 2014, and April 1, 2014 (collectively, "Plaintiff's CredStar Tri-Merge Credit Statements"). Attached as Exhibits 1 through 4, respectively, are true and correct copies of Plaintiff's Tri-Merge Credit Statements. In each instance, (a) the

prospective lender requested a CredStar Tri-Merge Statement; (b) the lender submitted the full social security number of the applicant; (c) the NCRA used that social security number and its proprietary algorithm to provide information the NCRA represented related to the applicant to achieve maximum possible accuracy; and (d) Credco accurately assembled and merged the information furnished by the NCRAs into Plaintiff's Tri-Merge Statements using the rules dictated by industry underwriting standards.  In other words, the information contained in Plaintiff's CredStar Tri-Merge Statements included the same information that Credco received from the NCRAs relating to Plaintiff.  While Credco offers other tri-merge products which may display information differently (such as Data HQ) or Credco may offer products which are not tri-merge statements but provide other data to assist lenders in their underwriting process (such as Credit Expert, Rapid Resolve, Rapid ReCheck), those products were not purchased by the lenders which ordered Plaintiff's CredStar Tri-Merge Statements.

7.    As to Plaintiff's CredStar Tri-Merge Statements, Credco employed numerous measures to assure that it accurately assembled and merged the data received from the NCRAs.  These measures include conducting data validation audits to assure that there were no discrepancies between the data provided by the NCRAs and the results expected by lenders.  For each of Plaintiff's CredStar Tri-Merge Statements, Credco used its proprietary technical process to

5

accurately assemble and merge the information that was provided by the NCRAs.
Additionally, Credco's systems employ rules to make certain that the information
being provided by each NCRA is consistent with the type of data typically
furnished by the NCRAs about consumers. This process helps assure that the
merge rules required by the lenders operates properly so that the information is
displayed consistent with the lender's requirements and expectations and is exactly
as provided by the NCRAs. It also permits Credco to return an error code when an
NCRA furnishes data which conflicts with the specifications provided by that
NCRA or the end user. As to Plaintiff's CredStar Tri-Merge Statements, these
processes did not raise any issues with the information furnished by the NCRAs.
The information was displayed consistent with the requirements of the lenders and
the restrictions of the NCRAs.

        8.     Plaintiff never notified Credco of any inaccuracies in the
information contained in Plaintiff's CredStar Tri-Merge Statements. None of the
NCRAs sent any communication informing Credco that the information it
furnished about Plaintiff was not "accurate." Credco was not aware of any issues
with the information furnished by any specific NCRA relating to Plaintiff.
Experian did not furnish any information concerning the Plaintiff which was
inconsistent with the type of data typically furnished by Experian about consumers.
Nor did Equifax. And neither did Trans Union. Prior to furnishing Plaintiff's

6

CredStar Tri-Merge Statements, Credco was not informed of any alleged inaccuracies in those statements.

         9.     Credco accurately assembled and merged the information furnished by Experian, Equifax and Trans Union in Plaintiff's CredStar Tri-Merge Statements at issue here. Credco has no knowledge of how or why the NCRAs matched the allegedly inaccurate information to Plaintiff. The NCRAs did not provide Credco with the personal identifying information the furnishers provided to them along with the account(s) at issue. Nor did the NCRAs provide Credco with the "matching" logic or algorithms that they used to determine which accounts and information relate to Plaintiff. Thus, if the NCRAs furnished two different dates of birth associated with a single social security number, as here, Credco has no way to determine which date of birth is correct, or whether the accounts associated by the NCRA with the underlying social security number do (or do not) relate to the consumer. My understanding is that users want to view such variations to, among other things, comply with their Red Flag Rule obligations to determine if identity theft is an issue in the transaction.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: 2/9/2015

Mercedes Vela

8

# EXHIBIT 1

THIS DOCUMENT IS FILED UNDER SEAL.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# EXHIBIT 2

THIS DOCUMENT IS FILED UNDER SEAL.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# EXHIBIT 3

THIS DOCUMENT IS FILED UNDER SEAL.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.

# EXHIBIT 4

THIS DOCUMENT IS FILED UNDER SEAL.
ACCESS IS PROHIBITED EXCEPT AS AUTHORIZED BY COURT ORDER.